UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **CHANDRA GRAHAM**<br><br>　　**Plaintiff,**<br>**v.**<br><br>**OKLAHOMA COUNTY CRIMINAL JUSTICE TRUSTEES; OKLAHOMA COUNTY SHERIFF; and CORPORAL MCKINLEY.**<br><br>　　**Defendants.** | §§§§§§§§§§§§§§§§§§§§<br><br>**CIVIL ACTION NO.   CIV-23-276-HE**<br><br>**JURY TRIAL DEMANDED** |

### PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff CHANDRA GRAHAM ("Plaintiff"), by and through her attorneys, brings this action on her behalf for damages and other legal and equitable relief from Defendants OKLAHOMA COUNTY CRIMINAL JUSTICE TRUSTEES; OKALAHOMA COUNTY SHERIFF; and CORPORAL MCKINLEY (collectively "Defendants"), for violations of rights under the United States Constitution, and any other cause(s) of action that can be inferred from the facts set forth herein.

### INTRODUCTION

1.　On March 25, 2021, Ms. Graham was subjected to inhuman conditions of confinement in the suicide watch wing of the Oklahoma County Detention Center ("the Jail") while in the custody of the Defendant Oklahoma County Sheriff ("Sheriff Defendant"). Such inhumane conditions consisted of standing water in her cell mixed with feces, urine, and

PLAINTIFF'S ORIGINAL COMPLAINT

1

unknown substances; bed bugs; overflowing toilets; and the denial of drinking water. Ms. Graham, as a pretrial detainee, was forced to endure such conditions for days all while fully naked. Ultimately, the inhumane conditions combined with the denial of medical treatment directly caused her to suffer serious and disfiguring injuries to her face and substantial harms to her mental health.

2. At the time, the Jail was under the control of Defendant Oklahoma County Criminal Justice Trustees ("the Trustees"). Under the Trustees, the Jail sanctioned conditions that became increasingly inhumane and intolerable to any human. In addition, the Jail suffered from a critical failure to adopt training and/or policies to ensure that pretrial detainees received immediate care for their serious medical concerns or any reasonable accommodations. All such issues were evident from numerous similar incidents and several official reports highlighting the unconstitutional conditions at the Jail.

3. Due to such widespread and pervasive unconstitutional conditions, Plaintiff brings this action to hold Defendants accountable for the injuries she suffered caused by Defendants' unlawful treatment of her as a pretrial detainee.

4. As a result of Defendants' unlawful actions, Plaintiff is entitled to recover for damages pursuant to violations of rights secured under the United States Constitution, including protections against the denial of basic human needs under the Fourteenth Amendment, actionable under 42 U.S.C. § 1983; protections against inhuman conditions of confinement under the Fourteenth Amendment, actionable under 42 U.S.C. § 1983, and any other legal and equitable relief as may be found appropriate based on the facts set forth herein.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to: (i) 28 U.S.C.A. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States; (ii) 28 U.S.C.A. § 1343(a)(3) which confers original jurisdiction upon this Court in any civil action to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; (iii) 28 U.S.C.A § 1343(a)(4), which confers original jurisdiction upon this Court in any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights a civil action to recover damages or to secure equitable; and (iv) under the Declaratory Judgment Statute, 28 U.S.C. § 2201; 42 U.S.C. §§ 2000e *et seq.*, as amended.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES

7. Chandra Graham is and has been, at all relevant times, a citizen of the United States and is a resident of the State of Oklahoma. Ms. Graham was incarcerated at the Oklahoma County Detention Center as a pretrial detainee during the relevant events.

8. The Oklahoma County Sheriff is an elected official and holds the ultimate authority for all operations, policies, and matters for the Oklahoma County Sheriff's Office; and serves as the ultimate authority for all matters regarding law enforcement within Oklahoma County. The Oklahoma County Sheriff holds legal custody over the persons incarcerated at the

Oklahoma County Detention Center. However, on June 10, 2019, Oklahoma County formally removed the Oklahoma County Sheriff from control over operations, training, practices, and/or policies at the Jail. All such powers were formally assumed by Defendant Oklahoma County Criminal Justice Trustees on July 1, 2020. The Oklahoma County Sheriff is sued in their official capacity, and resides within the Western District of Oklahoma.

9. Defendant Oklahoma County Criminal Justice Trustees are nine (9) trustees that include that represent the ultimate authority of the Oklahoma County Criminal Justice Authority ("the Jail Authority"). The Trustees include the Sheriff Defendant, an Oklahoma County Commissioner, three members selected by each district, and four members at large. is a local incarceration facility within Polk County, Texas. The Trustees develop the by-laws, policies, and procedures for the Oklahoma County Detention Center. As such, the Trustees establish, operate, and supervise all operations and policies regarding the care of people imprisoned within the Jail. The Trustees are further responsible for the implementation of the Jail's budget, policies, procedures, practices and customs; as well as the acts and omissions of the detention officers and employees based on the training and discipline of each detention officer and employee. The Oklahoma County Criminal Justice Trustees sued in their official capacity, and reside within the Western District of Oklahoma.

10. Corporal McKinley is a supervisory detention center and operates at the Oklahoma County Detention Center. At all relevant times, Corporal McKinley was acting under the color of law as an Oklahoma County Detention Center Officer in coordination with other employees at the Jail. Corporal McKinley is sued in his individual capacity.

## STATEMENT OF FACTS

*A. The Deprivation of Ms. Graham's Constitutional Rights*

11. On March 25, 2021, Chandra Graham was brought to the Oklahoma County Detention Center following an arrest by members of the Oklahoma City Police Department. At that time, Ms. Graham had not been formally convicted of any crime.[1]

12. At or around 1:21 AM, detention officers at the Jail began Ms. Graham formal intake screening and procedures. As part of this intake process, Ms. Graham was asked a series of questions related to her physical and mental health; including questions related to any suicidal ideation.

13. Prior to Ms. Graham's incarceration, she was being taken to receive treatment for mental health disabilities arising from an eating disorder. As such, Ms. Graham was under severe mental stress during the intake process caused by her mental health disabilities and expressed suicidal ideations to the intake officers.

14. As a result, the intake officers recommended that Ms. Graham be housed in "Suicide Precautions" Wing of the Jail known internally as "SP2". Ms. Graham was subsequently taken to the SP2 wind at or around 2:00 AM.

15. As part of the Jail's Suicide Watch procedures, Ms. Graham's clothes were removed before she was locked in her cell. However, the Jail did not provide any other clothes. Ms. Graham was thus forced to remain naked throughout her incarceration in the SP2 wing. The Jail officers proceeded to place Ms. Graham in a cell with another inmate who was also naked.

16. The lack of any clothes was further exacerbated by inhuman conditions in every cell in the SP2 wing, and specifically in Ms. Graham's cell.

---

[1] Ultimately all the chargers were dropped.

PLAINTIFF'S ORIGINAL COMPLAINT

5

17. The conditions represented a substantial health risk because the floor of Ms. Graham's cell was covered in an amalgam of feces, urine, other bodily fluids, and an unknown chemical substance.

18. The mixture of feces, urine, and other liquids was present in many of the SP2 cells due to recent flooding that caused the sewage system to back up and spread throughout the floors.

19. Despite placing Ms. Graham and others in such conditions, the Jail staff did not than clean the cells and remove the inhuman and dangerous liquid. Rather, the Jail staff proceeded to shut off all the water and plumbing to the SP2 wing to stem the flooding. As such, all the cells in the SP2 wing were classified as "dry cells" and had no direct water access.

20. In addition, the Jail staff attempted to use saran wrap to stop the toilets in each cell from continuing to overflow with excrement. However, the saran wrap failed to offer any solution as the only toilet in Ms. Graham's the cell was overflowing with excrement.

21. The water shutoff and the saran wrap further rendered the toilets in the cells unusable. Upon information and belief, the lack of any usable toilets contributed to the intolerable liquid on the floor of the cells as the inmates were forced to relieve themselves on the floor of the SP2 cells.

22. Immediately upon Ms. Graham's incarceration in the cell, she was disgusted and afraid that she may get suffer from an illness related to the conditions. Unfortunately, her fears became a reality after she accidentally got some of the mixture of feces, urine, bodily fluids, and the unknown chemical on her face and eyes.

23. The liquid immediately caused her to feel discomfort and pain on her face and in her eyes. As a result, Ms. Graham desperately asked only for some water to wash off the liquid.

But none of the Jail officers responded to her request for water, despite clearly hearing her requests for aid. Ms. Graham continued her requests for water for over an hour but still no Jail employee responded to her requests.

24. At this time, Defendant McKinley directly oversaw the SP2 wing, and held supervisory power over the Jail officers charged with providing care to the SP2 inmates. Defendant McKinley was thus provided direct notice of Ms. Graham's calls for aid but took no action. Nor did Defendant McKinley direct any of the officers in his command to provide such aid.

25. Ms. Graham eventually became exhausted due to her calls for help and also from the fact she had been unable to sleep that night due to the arrest and intake process. Ms. Graham subsequently attempted to sleep in the cell.

26. However, Ms. Graham was only able to sleep for about an hour because she was woken up by her cellmate calling for the Jail officers' attention. Specifically, Ms. Graham's cellmate was yelling for the Jail officers to provide Ms. Graham with immediate medical attention because Ms. Graham's eyes had nearly swollen shut.

27. But no Jail officer or employee responded to Ms. Graham's cellmate's calls for immediate medical attention, despite the fact that approximately three (3) to five (5) guards overheard such calls for aid.

28. Ms. Graham subsequently joined her cellmate and also called for immediate medical attention but none was provided. At that time, Ms. Graham's need for medical attention was clearly obvious due to the swelling on her face. But neither Defendant McKinley, nor any of the officers under his command provided Ms. Graham medical attention.

29. Throughout this time, Ms. Graham's facial and eye symptoms worsened and became increasingly severe. But still no treatment was provided even after a Jail mental health therapist provided written notice on or around the morning of March 27, 2023 that Ms. Graham's face was severely irritated and her right eye was swollen shut.

30. Later that same day, Ms. Graham was finally relocated from the inhuman conditions of the SP2 wing to the Behavioral Health Unit. Despite the transfer, Ms. Graham was still denied any medical treatment.

31. Once inside the Behavioral Health Unit, Ms. Graham made continuous "sick calls" in order to receive some sort of medical treatment for her worsening symptoms.

32. To make such sick calls in the Behavioral Health Unit, an inmate was required to press the "medical button" thereby officially notifying the Jail that medical attention was needed. In total, Ms. Graham pressed the medical button approximately fifty (50) times without any response by the Jail.

33. It was only until on or around March 28, 2021 that any Jail employee offered a response. Unfortunately, the response did not include a medical evaluation by a doctor. Instead, a nurse simply provided Ms. Graham an unknown cream for her face, but did nothing further. However, the cream failed to effectively treat Ms. Graham's visibly obvious symptoms or her increasing pain.

34. Ultimately, Ms. from custody on or around March 29, 2021 to her mother before she received any medical treatment beyond the ineffective or a medical evaluation from the Jail.

35. Upon her release, Ms. Graham was immediately taken to a local hospital, INTEGRIS HEALTH, by her mother because of Ms. Graham's obvious and serious medical concerns as evidenced by the photo below



36. The medical staff at INTEGRIS Health immediately determined that Ms. Graham had sustained chemical burns to the face "likely related to some type of chemical burn with a combination of urine and feces." Ms. Graham was also diagnosed with (i) acute bacterial conjunctivitis of both eyes; (ii) a severe facial rash; and (iii) facial cellulitis.

37. Ms. Graham needed immediate burn treatment, and was required to undergo surgery to drain a substantial abscess of her right eyelid.

38. As a result of actual medical treatment provided by INTEGRIS Health, Ms. Graham was able to avoid potentially even worse conditions, such as fully losing her eyesight or death from sepsis. Unfortunately, the delay in medical treatment led to Ms. Graham needing months of treatment and rehabilitation to fully treat such serious medical harms.

39. At this time, Ms. Graham still suffers from recurrent effects of folliculitis, and continues to struggle the extensive emotionally impact caused by the Defendants' unlawful actions.

### B. *The Jail's Unconstitutional Conditions of Confinement*

40. Ms. Graham's experiences were not unique among pretrial detainees incarcerated at the Jail. In fact, numerous Oklahoma State and Federal entities reported on the Jail's inhuman conditions at or around the time of Ms. Graham's experiences.

41. One report by the National Institute of Corrections (NIC) under the federal Bureau of Prisons (BOP) was particularly critical of the conditions at the Jail. The report was made after the Trustees commissioned Jail Administrator Greg Williams to seek help from the NIC in early 2021.

42. The trustees sought such help because the Trustees were aware that the Jail "had immediate critical issues including severe water leaks throughout the building, no hot water, no air conditioning, staffing shortages, and much more of concern like holes between the cells large enough for inmates to crawl thru."

43. In the report, the NIC noted that "[a]ll of the housing units [] visited were in poor conditions … [w]ater leaks could be seen has having been in the units in multiple locations with

stains everywhere. This has caused ceilings to be corrupted, handing down, and stained." The report also noted a cell that "was filthy with the toilet and sink backed up with water[.]" All in all, the report stated that "pod and cell cleanliness is clearly an issue" at the Jail.

44. The report further established that the Jail in 2019, "had 6,630 work orders issued. Of these 2,310 were completed leaving 4,312 unfinished." However, the Jail failed to provide the NIC with any such data for 2020 and 2021, but the report noted that the number of unfinished work orders meant that "the implication is clear that the [Jail] staff needs to help correct these 'Conditions of Confinement.' "

45. Another report by the Oklahoma State Department of Health came to similar conclusions in November 11, 2021. The Dept. of Health had visited the Jail earlier that year and noted that the Jail maintained repeat deficiencies in its conditions of confinement. A "Repeat Deficiency" indicates that Dept. of Health had found such issues in earlier evaluations as well.

46. But the November 11, 2021 report specifically found a repeat deficiency because "[s]everal of the cell, floors, walls, washbasins, showers, and common areas…were observed…to have a build-up of dirt debris and trash."

47. The report further noted that: (i) a women's holding cell "had a strong pungent order of urine, with an unknown substance splattered on the walls[;]" (ii) the floor in numerous cells "had standing water on the floor which appeared to be coming from a leaking toilet and washbasin unit[;]" and (iii) there was "feces laying on floor in front of the elevators."

48. Ultimately the report observed that the Jail "failed to provide inmates with materials and supplies to maintain clean showers, washbasins, and toilets[,]" and that this was a "REPEAT DEFIENCY".

PLAINTIFF'S ORIGINAL COMPLAINT

11

49. In February 2021, only a month prior to Ms. Graham's experiences, another report by the Oklahoma State Department of Health found that "showers at the [J]ail … were covered in 'black residue which appeared to be mold and mildew.' " The report further observed standing water in the Jail that had a "strong and pungent odor[.]"

50. The Dept. of Health also reported that inmates had told investigators that the facilities had been in such conditions for several months, and that living quarters were dirty, flooded with several inches of water, and unsafe.

51. Such inhumane conditions ultimately culminated in a hostage standoff at the Jail during Ms. Graham's incarceration on or around March 27, 2021. During the hostage standoff, an inmate was recorded stating that "The water don't work," and that "[t]he toilet's backed up. This is what we're dealing with."

52. Shortly after the hostage standoff, the Oklahoma County District Attorney David Prater stated that such inhumane conditions were caused by the "incompetent administration of that jail. It's the incompetence of the [Trustees]." DA Prater further stated that "the [Trustees] and its administration of the Oklahoma County Jail is an abject failure that has cost the lives of inmates, made the environment incredibly dangerous for law enforcement and other jail staff members."

53. In response to these events, one of the Trustees acknowledged that there were serious issues at the Oklahoma County Jail, and stated that "I would have told you before the trust even took over the jail that it's going to take years, at least a couple or three years, to change the culture and to get in and get control."

54. Such numerous reports, the request for aid by the Trustees to the NIC, and the public comments of a Trustee member all indicate that the Trustee had notice and actual

knowledge that conditions at the Jail were inhumane, and explicitly included cells that were flooded with standing water, feces, urine, and other dangerous materials. Despite such actual notice and knowledge, the Trustees failed to change the inhuman conditions. As such, the Trustees effectively endorsed and adopted these inhuman conditions for pretrial detainees at the Jail.

### AND AS FOR A FIRST CAUSE OF ACTION FOR A VIOLATION OF
**42 U.S.C. § 1983, Civil Action for Deprivation of Rights**
**(Denial of Basic Human Needs – Medical Care)**
**(As to all Defendant McKinley)**

55. Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

56. The conduct alleged herein deprived Plaintiff of rights and privileges secured and protected by the United States Constitution and the laws of the United States, namely the Fourteenth Amendment right to be free from punishment and the right to medical care.

57. Defendant McKinley deliberately refused to treat Ms. Graham, ignored here serious medical complaints, delayed emergency medical treatment, and evinced a wanton disregard for Ms. Graham's serious medical needs that violated her clearly established constitutional rights.

58. A government official violates a pretrial detainees' Fourteenth Amendment right to medical care when the official acts with deliberate indifference to a pretrial detainees' serious medical needs. Officials act with deliberate indifference to serious medical needs when (i) the officials are aware of underlying facts indicating a substantial risk of serious harm exists and (ii) the officials must also draw the inference.

59. Deliberate indifference to serious medical needs can be established by the refusal to treat an inmate, ignoring medical complaints, intentionally incorrect medical treatment, or any

13

PLAINTIFF'S ORIGINAL COMPLAINT

similar conduct that would clearly evince a wanton disregard for any medical needs. Further, the denial of recommended medical treatment is often sufficient to show deliberate indifference, or sufficient exceptional circumstances evincing such a disregard for the inmates' basic medical needs.

60.  Defendant McKinley had actual knowledge that Ms. Blackmon was experiencing significant medical symptoms, and was on notice that she had severe and serious medical issues from the chemical burns on her face, and severe swelling of her eyes. Defendant was aware of the substantial risk of serious harm that result from failing to treat such issues, but failed to treat Ms. Graham and ignored her numerous medical complaints.

61.  Defendant McKinley denial of medical care, delay of appropriate medical testing, and delay of emergency medical treatment deprived Ms. Graham of her basic human need of medical care and allowed her medical issues to become more severe. As a result, Ms. Graham suffered extreme pain and suffering, and was ultimately forced to receive a undergo emergency treatment at the INTEGRIS Health center to avoid blindness and potentially death.

62.  Defendant McKinley also acted with evil motive or intent and/or reckless and callous indifference to Ms. Graham's Fourteenth Amendment rights, entitling Plaintiff to punitive damages.

63.  Plaintiff's requests for relief are set forth below.

## AND AS FOR A SECOND CAUSE OF ACTION FOR A VIOLATION OF
### 42 U.S.C. § 1983, Civil Action for Deprivation of Rights
### (Inhuman Conditions of Confinement)
### (As to Defendants Oklahoma County Sheriff and Oklahoma County Criminal Justice Trustees)

64. Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

65. The conduct alleged herein deprived Plaintiff of rights and privileges secured and protected by the United States Constitution and the laws of the United States, namely the Fourteenth Amendment right to be free from punishment and humane conditions of confinement.

66. Under the Fourteenth Amendment, conditions of confinement are unconstitutional when the conditions are sufficiently serious due to the severity of the alleged deprivations and/or the length of time in such conditions.

67. However, the length of time a prisoner must endure an unsanitary cell is only one factor in the constitutional calculus; equally important is the degree of filth endured. In other words, the length of time required before a constitutional violation is made out decreases as the level of filthiness endured increases. Conditions of confinement that include close proximity to human waste are particularly offensive.

68. When a claim also involves numerous alleged inhuman conditions of confinement may establish constitutional violation in combination when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.

69. In addition, a conditions of confinement claim requires the conditions were not rationally related to a legitimate governmental objective or were excessive in relation to that

purpose. Such a finding can also be established by showing an expressed intent to punish on the part of detention facility officials.

70. Ms. Graham was subjected to particularly severe conditions of confinement due to her extreme proximity to human waste that allowed such waste to come into contact with her face. Such conditions are particularly egregious when combined with the fact that Ms. Graham was forced to remain in proximity to such human waste for days while forced to remain fully naked, and was denied any access to drinking water or toilet facilities.

71. Nor were such conditions rationally related to any governmental purpose as there is no legitimate governmental purpose behind forcing pretrial detainees to remain in close proximity to human waste after they are stripped naked. Even if such conditions resulted from flooding, then they are particularly excessive in relation to that need considering such conditions could have been easily addressed with a proactive effort to clean the cells.

72. In this matter, Defendants are liable on behalf of their municipalities as the Trustees, as final policymakers, approved, ratified, and promulgated the longstanding practice and/or customs that led to such inhumane conditions of confinement. Defendants had actual notice and knowledge of such inhumane conditions across the Jail based on the numerous reports, their own public comments, and their own requests for aid.

73. Despite such knowledge, Defendants failed to act to prevent pretrial detainees from being forced into such conditions, and thus were deliberately indifferent to Ms. Graham's unconstitutional conditions of confinement.

74. The Defendants' failures to address such conditions of confinement was a moving factor behind Ms. Graham's injuries suffered from exposure to the amalgam of feces, urine, other bodily fluids, and an unknown chemical substance in her cell.

75. Plaintiff's requests for relief are set forth below.

## DEMAND FOR JURY TRIAL

76. Plaintiff demands a jury trial on all matters raised in this Complaint.

## PRAYER FOR RELIEF

Plaintiff respectfully requests judgment against Defendants as follows:

A. Declaring that the practices complained of herein are unlawful and in violation of the rights of the Plaintiff under the U.S. Const. and 42 U.S.C. § 1983;

B. Awarding all damages which Plaintiff has sustained as a result of Defendants' conduct, including for physical injuries, medical bills, emotional distress, and anguish;

C. Pre-judgment and post-judgment interest, as provided by law;

D. Awarding Plaintiff punitive damages in an amount commensurate with Defendants' ability and so as to deter future malicious, oppressive, and/or malicious conduct;

E. Granting Plaintiff reasonable and necessary attorneys' fees and expenses which Plaintiff has incurred and will continue to incur during all trial and appellate court proceedings pursuant to 42 U.S.C. § 1988;

F. Awarding Plaintiff damages for conscious pain and mental anguish, and exemplary damages;

G. That the Court retain jurisdiction over Defendants until such time as it is satisfied that they have remedied the practices complained of and are determined to be in full compliance with the law; and

H. Awarding Plaintiff such other and further legal and equitable relief as may be found appropriate and as the Court may deem just or equitable.

Plaintiff also seeks injunctive relief, including, but not limited to:

A. Supervisory discipline up to and including termination for any agent of Defendants' personnel who improperly handle inmates' requests for medical care;

B. Supervisory discipline up to and including termination for personnel or any other agent of the listed Defendants who were involved in the incidents described herein;

C. Monitoring by the Court or a federal agency to ensure that Defendants comply with all injunctive relief.

Plaintiff further demands that she be awarded such other and further legal and equitable relief as may be found appropriate or as the Court may deem just or equitable

Dated: March 27, 2023						Respectfully submitted,

						*/s/David W. Henderson*
						David W. Henderson
						Texas State Bar No. 24032292
						dhenderson@equalrights.law
						Jay D. Ellwanger
						Texas State Bar No. 24036522
						jellwanger@equalrights.law
						J. Sebastian Van Coevorden
						Texas State Bar No. 24128101
						svancoevorden@equalrights.law
						**Ellwanger Law LLLP**
						400 S Zang Blvd, Suite 600
						Dallas, Texas 75208
						Telephone: (214) 948-3334
						Facsimile: (214) 853-9410

						**COUNSEL FOR PLAINTIFF**